IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

HOGAR CREA, INC., et al.,

      Plaintiffs,

      v.

HOGAR CREA INTERNATIONAL OF
CONNECTICUT, INC., et al.,

      Defendants.

Civil No. 08-1547 (FAB/BJM)

## OPINION AND ORDER

Plaintiffs Hogar CREA, Inc., and Hogar CREA International, Inc. (collectively, "plaintiffs") bring this action against a number of defendants, including Hogar CREA International of Connecticut, Inc. ("HCCT"), Hogar CREA International of Massachusetts ("HCMA"), and certain individual officers of those organizations (collectively, "defendants"). (Docket No. 1). Defendants HCMA and HCMA officers[1] moved to dismiss for lack of personal jurisdiction or alternatively to transfer venue to the District of Massachusetts. (Docket Nos. 16, 17, 41). Plaintiffs opposed (Docket No. 25, 28). Defendants HCCT and HCCT officers[2] moved to dismiss for lack of personal jurisdiction or alternatively to transfer venue to the District of Connecticut (Docket No. 42), and plaintiffs opposed (Docket No. 52). Plaintiffs amended their complaint (Docket No. 67), and HCMA moved to strike (Docket No. 70). The court denied the motion to strike, but deemed the pending motions to dismiss and/or transfer venue to apply to the amended complaint. (Docket No. 71). However, because the

---

[1] The HCMA officer defendants are Gumercindo Gómez and José Molina. For ease of reference, the court refers throughout to HCMA and the HCMA officer defendants collectively as HCMA, except where otherwise noted.

[2] The HCCT officer defendants are Guarberto Santiago, Oscar Meléndez, Gladys Toledano, Margarita Quiñones, José Antonio Contreras, Janet Dunning, and Edwin Rivera Pacheco. For ease of reference, the court refers throughout to HCCT and the HCCT officer defendants collectively as HCCT, except where otherwise noted.

amended complaint added a federal claim, the court ordered the parties to renew their motions to

dismiss for lack of personal jurisdiction or alternatively to transfer venue, taking into account that the

amended complaint purports to base jurisdiction on the existence of a federal question (Docket No.

77), and the parties complied (Docket Nos. 83, 84, 91).  The parties consented to proceed before a

magistrate judge (Docket Nos. 62, 63, 64) and the case was referred to me.  (Docket No. 65).

## FACTUAL BACKGROUND

Hogar CREA, Inc. ("HCPR"), and Hogar CREA International, Inc. ("HCI"), are non-profit

organizations organized under the laws or Puerto Rico and with their principal places of business in

Trujillo Alto, Puerto Rico.  (Docket No. 67, ¶ 1, 2).  HCPR was founded in 1968 by Juan José Garcia

Ríos ("Garcia-Ríos") and originally consisted of a single residential home providing prevention,

counseling, and rehabilitation treatment to drug and alcohol users, and was later expanded to include

additional residences.  (Id., ¶ 26).  HCPR employs a distinctive treatment system in which recovering

addicts live together in a therapeutic setting in residential homes together with former addicts and

licensed therapists.  (Id., ¶ 27).  At present, HCPR operates 85 residential homes in Puerto Rico.  (Id.,

¶ 33).  "Hogar CREA" has been a registered trademark over the past 13 years, although the trademark

registration expired in January 2009 and is not currently active.  (Id., ¶ 30; Docket No. 28-2).

Over the years, HCPR expanded outside of Puerto Rico to various Latin American countries

as well as to Spanish-speaking communities in Pennsylvania, Connecticut, Massachusetts, and other

U.S. states.  (Docket No. 67, ¶ 35).  HCI was formed in 1983 to support the expansion of Hogar

CREA entities outside of Puerto Rico and in order to control the nature and quality of services

provided by those entities.  (Id., ¶ 39).  Hogar CREA organizations formed in the United States (the

"U.S. entities") were modeled on HCPR's organization, constitution, and by-laws, and use the Hogar

CREA mark subject to plaintiffs' authorization and control.  (Id., ¶ 42).

Hogar CREA entities in the United States typically were formed when a HCPR graduate or

someone otherwise involved in HCPR relocated to the new state and, using the Hogar CREA name,

garnered community support and financial backing to establish the organization in that state.  (Docket

No. 67, ¶ 44).  The individuals establishing these U.S. entities received logistical and, sometimes, financial support from plaintiffs.  (Id., ¶ 45).  Each U.S. entity operated using the HCPR model and "highly specific Hogar CREA treatment system."  (Id., ¶ 46).

Plaintiffs demonstrate that HCI plays a role in supervising all Hogar CREA organizations, including the U.S. entities.  (Docket No. 52-3).  HCI's governing board is the "International Steering Committee," which is charged with supervising all Hogar CREA organizations, evaluating their performance and mandatory yearly reports, ensuring compliance with HCI's philosophy and methods, establishing dues to be paid by the Hogar CREA organizations, regulating the bookkeeping and accounting of the organizations, and establishing policies with respect to the functioning, operation, and administration of all organizations.  (Id., p. 12-14).  The HCI constitution was adopted by delegates representing each country where Hogar CREA had an operation, including the U.S., attesting through their signatures that the document reflected the "will" of their respective organizations.  (Id., p. 36).

Each Hogar CREA U.S. entity operates under a constitution and a set of by-laws, which are identical in all material respects.  (Docket No. 52-9).  The constitution formalizes the relationship between the U.S. entities and HCI in the following ways: (1) HCI appoints each U.S. entity's steering committee (the equivalent of a Board of Directors) (p. 6); (2) each U.S. entity implements HCI's treatment philosophy in its own organization (id.); (3) each U.S. entity is responsible for complying with the objectives, purposes, and philosophy of the HCPR (p. 18); (4) prior to his death, HCPR founder Garcia-Ríos was a member of each U.S. entity's steering committee with a right of veto (p. 7); (5) each U.S. entity is required to consult with the International Steering Committee or international president prior to opening or closing any treatment homes (id.); (6) each U.S. entity is required to submit reports to the International Steering Committee (id.); (7) each U.S. entity is required to implement all decisions of the International Steering Committee and to participate in international activities sponsored by HCI (p. 18); (8) the president of each U.S. entity must assume duties delegated to him by the International Steering Committee, participate in HCI activities at the

national and international levels, implement all decisions of the International Steering Committee, and act as a consultant to the International Steering Committee (p. 10); (9) the decisions made by the president of each U.S. entity are required to be compatible with the philosophy and policies of HCI (p. 11); (10) the constitution of each U.S. entity may only be amended with the advice and consent of the International Steering Committee and final approval of HCI (p. 18); and (11) each U.S. entity may only be dissolved with the consent of HCI (id.).  (Docket Nos. 52-14, 67-2).

An identical set of by-laws governs each U.S. entity's operating structure, acquisition and administration of bank accounts, budgeting, bookkeeping, administration of petty cash, purchase of equipment and vehicles, handling of inventory, food control, physical facilities, and human resources. (Docket No. 28-10).  The by-laws provide that they may be amended only with approval of the International Steering Committee. (Id., p. 16).

In 2003, Hogar CREA of U.S.A., Inc. (the "National Steering Committee") was formed in order to support and oversee the operations of the U.S. entities.  (Docket No. 67, ¶ 55; 28-13, p. 3). The National Steering Committee is authorized to dissolve any local or state organization which in any way does not conform to Hogar CREA guidelines and authority.  (Docket No. 28-13, p. 4).

HCMA is a nonprofit corporation organized under the laws of Massachusetts in 1997, with its principal place of business in Springfield, Massachusetts.  (Docket No. 16, p. 3-4; 28-6).  HCMA offers its services and operates treatment homes exclusively in Massachusetts.  (Docket No. 16, p. 4).  The HCMA officer defendants are also residents of Massachusetts.  (Id.).  Plaintiffs submitted an affidavit from Martin Cotto Colon ("Cotto") attesting that in 1997, HCI, through Garcia-Ríos, "instructed [him] to organize a Steering Committee, and Incorporate the opening of the first Hogar CREA in the State of Massachusetts." (Docket No. 34-2, ¶ 2, 3).  HCMA was thus incorporated in Massachusetts in order to comply with state regulations.  (Id., ¶ 6).

HCCT was founded in 1988 when HCI charged Valentin Rosario with organizing a steering committee in order to organize a Hogar CREA center in Hartford, Connecticut.  (Docket No. 59-3). HCI also "sent" Edwin Rivera Pacheco to assist with the establishment of HCCT.  (Docket No. 52-9).

Plaintiffs submitted evidence showing that in approving a decision to grant funds to HCCT for the establishment of a treatment center in Hartford, the Hartford City Council noted that Hogar CREA was a "[n]ationally recognized" drug addiction treatment program.  (Docket No. 52-10).

Plaintiffs candidly explain that for the initial thirty-four years of the group's existence, Hogar CREA depended in great part on the personality of its founder García-Ríos, and that after García-Ríos passed away in 2002, "certain power struggles arose within the organization."  (Docket No. 67, ¶ 57).  This case, undoubtedly, arises out of those power struggles.  Plaintiffs allege that their "attempts to regulate" the U.S. entities have been met with "resistence and even defiance".  (Id., ¶ 58).  Specifically, plaintiffs allege that (1)  HCCT created a new and separate for-profit corporation, defendant Hogar CREA Workforce of CT,  L.L.C. ("HCCT-Workforce"), without plaintiffs' authorization; (2) HCCT used the trademarked Hogar CREA name in forming HCCT-Workforce without plaintiffs' authorization; (3) HCCT and HCCT-Workforce have improperly commingled their funds; (4) all defendants have failed to implement and observe the rules and regulations promulgated by plaintiffs as well as the rules contained in their own by-laws; (5) all defendants have obstructed and impeded plaintiffs from auditing and supervising their operations, including denying plaintiffs access to their financial records; (6) HCCT officers have ignored rules and standards in their handling of corporate monies and personnel matters; (7) certain HCCT officers have engaged in self-dealing transactions; (8) HCCT, HCMA, and their officers have engaged in improper real estate transactions; and (9) as a result, plaintiffs have been unable to exercise control over the services provided by the U.S. entities in order to ensure the proper management and operations of those entities as well as to safeguard the trade name "Hogar CREA".  (Id., ¶ 59-70).

Plaintiffs' amended complaint brings the following causes of action:  (1) unfair competition under federal trademark law and applicable state trademark law, seeking injunctive relief (Count 1); (2) trademark dilution under federal trademark law and applicable state trademark law, seeking injunctive relief (Counts 2 and 4); (3) trademark infringement seeking injunctive relief (Count 3); (4) right to an accounting under applicable tort law (Count 5); (5) tort damages based on improper use

of Hogar CREA funds under applicable tort law (Count 6); (6) ultra vires act of corporation under applicable corporations law (Count 7); (7) breach of contract under applicable contract law (Count 8); (8) breach of implied trademark licensing agreement under applicable contract law (Count 9); (9) tortious interference with contract under applicable tort law (Count 10); (10) damage to goodwill under applicable tort law (Count 11); (11) corporate veil piercing to surrender control of corporation, under applicable corporations law (Count 12); (12) self-dealing under applicable tort law (Count 13); and (13) order to cease and desist use of trademark license under applicable federal and state trademark law (Count 14).  (Docket No. 67).

HCMA and HCCT moved to dismiss for lack of personal jurisdiction or, alternatively, to transfer venue to the District of Massachusetts or Connecticut, respectively, submitting supporting evidence.  (Docket Nos. 16, 17, 41, 42).  In support of its motion, HCMA asserts that it is not a subsidiary or affiliated corporation of HCPR or HCI, and has never received financial assistance from plaintiffs.  (Docket Nos. 16, p. 4).  Moreover, HCMA is a Massachusetts corporation which offers its services only in Massachusetts.  (Id.).  HCMA is neither registered nor conducts business in Puerto Rico, does not have agents in Puerto Rico, and does not own property in Puerto Rico.  (Id.).  HCMA explains that its directors and officers work voluntarily, are mostly former blue-collar workers who have retired due to disability, and lack resources to travel to Puerto Rico to defend this litigation. (Docket No. 41, p. 6).  Further, HCMA income consists of approximately $4,000.00 from the sales of baked goods, which pay for the expenses of its twelve drug rehabilitation patients.[3]  (Id.).  HCCT did not submit evidence in support of its motion.  (Docket No. 42).

Plaintiffs opposed (Docket No. 25, 52), submitting supporting documents (Docket No. 28, 52). In addition to the facts alleged (and supported with documentary evidence) in their amended complaint, plaintiffs submitted additional evidence in their opposition.  With respect to individual

---

[3] HCMA contrasts this point with evidence that HCI's tax statements show that it had over $2 million in assets in the last tax filing available, dated 2006.

defendant Gumersindo Gomez, President of HCMA, plaintiffs adduce evidence that he traveled to
Puerto Rico in August of 2005 to represent HCMA in an assembly of HCI. (Docket No. 28-22).   In
that assembly, Gomez was elected Secretary of HCI's International Steering Committee, the
governing body of HCI. (Docket No. 34-7).  They also note that Gómez was a signatory, again in his
capacity as HCMA president, to a resolution concerning internal dissent within the Hogar CREA
organizations.  (Docket No. 48-4).  In that document, Gómez and the other signatories adopted the
resolution based on "the rights granted us by the rules and regulations which govern the Hogar CREA
movement, and applicable judicial system."  (Id., p. 1).  The signatories assert that they are the
"authentic representatives of the Hogar CREA movement, and members of Hogar CREA
International, Inc."  (Id., p. 2).  Plaintiffs assert that throughout the course of their duties within
HCMA, Gómez and co-defendant José Molina have had regular and frequent contacts with HCI and
HCPR through mail, email, and telephone.  (Docket No. 25, p. 10).

   With respect to the HCCT officer defendants, plaintiffs put forth evidence that Guarberto
Santiago and Edwin Rivera Pacheco ("Rivera") traveled to Puerto Rico in August of 2005 to represent
HCCT in an assembly of HCI.  (Docket No. 52, p. 10).  Plaintiffs assert that the HCCT defendants
have all had regular and frequent contacts with the Hogar CREA Puerto Rico organizations.  Beyond
this bare assertion, plaintiffs did not submit any evidence supporting the other HCCT defendants'
alleged connections to the forum, arguing that their forum contacts exist "by virtue of the corporate
relationships and contacts between [HCCT] and its parent corporations."  (Docket No. 52, p. 1).

## ANALYSIS

### I.   Personal Jurisdiction

#### A.    Legal Standard

   In deciding a defendant's Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction,
the plaintiff bears the burden of persuasion on the elements of relatedness and minimum contacts.
Foster-Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 145 (1st Cir. 1995).  Under the "prima
facie" standard, the district court need "consider only whether the plaintiff has proffered evidence

that, if credited, is enough to support findings of all facts essential to personal jurisdiction." Boit v. Gar-Tec Products, Inc., 967 F.2d 671, 675 (1st Cir. 1992).  In conducting this prima facie analysis, courts "take specific facts affirmatively alleged by the plaintiff as true (whether or not disputed) and construe them in the light most congenial to the plaintiff's jurisdictional claim." Mass. Sch. of Law v. Amer. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998).  The court may also consider facts put forward by the defendant to the extent that they are uncontradicted.  Id.  However, the court does not "credit conclusory allegations or draw farfetched inferences." Ticketmaster-New York v. Alioto, 26 F.3d 201, 203 (1st Cir. 1994).

The court may, alternatively, employ a preponderance-of-the-evidence standard, holding an evidentiary hearing in order to "adjudicate the jurisdictional issue definitively before the case reaches trial." Foster-Miller, Inc., 46 F.3d at 146.  However, a court need only hold an in-court evidentiary hearing where a party so requests, and where "issues of credibility are presented and must be resolved to determine an issue of fact material to the court's disposition of the motion to dismiss." Boit, 967 F.2d at 676.  Here, no party has requested an evidentiary hearing, and moreover, the issues on this motion do not involve any determinations of credibility requiring live testimony in order to make a determination.  Therefore, the court applies the prima facie standard to evaluating whether plaintiffs have met their burden of establishing a basis for jurisdiction.

### B.    General Rule

The Due Process Clause of the Fourteenth Amendment limits a state's exercise of in personam jurisdiction over nonresident defendants. Helicopteros Nacionales de Colombia, S. A. v. Hall, 466 U.S. 408, 414 (1984).  Due process considerations are satisfied where the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Id. (alteration in original) (citing International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).

Where the court's jurisdiction is premised on diversity jurisdiction, the forum state's long-arm statute governs the dispute. Pizarro v. Hoteles Concorde Int'l, C.A., 907 F.2d 1256, 1258 (1st Cir.

1990).   Puerto Rico's long-arm statute allows courts to exercise jurisdiction over non-resident defendants if, *inter alia*, the action arises because the non-resident transacted business in Puerto Rico personally or through an agent or if the action arises because the non-resident participated in tortious acts within Puerto Rico personally or through his agent. 32 L.P.R.A. Ap. III R. 4.7.  The First Circuit has noted that Puerto Rico's long arm statute "extends personal jurisdiction as far as the Federal Constitution permits." Pritzker v. Yari, 42 F.3d 53, 60 (1st Cir. 1994).

Where a case is brought under federal question jurisdiction, it is governed by the due process clause of the Fifth Amendment.  United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 618 (1st Cir. 2001).  Under the Fifth Amendment, due process requires only that the defendant have adequate contacts with the United States as a whole, rather than with a particular state. Id.  However, the plaintiff "must still ground its service of process in a federal statute or civil rule." Id.  The Lanham Act, the federal statute at issue here, does not provide for nationwide service of process.  See 15 U.S.C. §§ 1051 *et seq*.; Girl Scouts of the United States v. Steir, 102 Fed. Appx. 217, 219 (2d Cir. 2004).  Where the federal statute at issue does not include a service of process provision, "then Rule 4(e) allows extraterritorial service of process only to the extent permitted by the law of the state in which the district court sits." Lorelei Corp. v. County of Guadalupe, 940 F.2d 717, 720 (1st Cir. 1991). The Rule 4(e) analysis, in turn, applies the same two-step analysis of the due process inquiry: (1) the court considers whether the state long-arm statute authorizes jurisdiction, and (2) if it does, the court must determine whether the exercise of personal jurisdiction is consistent with the due process requirements of the Fourteenth Amendment. Id.  Therefore, and as the parties agree[4], the due process analysis is unaltered by the presence of the federal claim.

To satisfy due process concerns, personal jurisdiction may be based on either general or specific jurisdiction.  In order to establish general jurisdiction, a plaintiff must demonstrate two

---

[4] Because plaintiffs amended their complaint to add a federal claim subsequent to the briefing on this motion, I ordered the parties to address in supplemental briefings whether the addition of a federal claim altered the standard for determining personal jurisdiction.  (See Docket Nos. 77, 83, 84, 91).

criteria: (1) there must be continuous and systematic general business contacts between the non-resident defendant and the forum; and (2) the exercise of jurisdiction would be reasonable.  Swiss Am. Bank, Ltd., 274 F.3d at 619.  Here, plaintiffs proceed on a theory of specific jurisdiction.[5]  The First Circuit has established a "tripartite test" to determine whether specific jurisdiction exists.  United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp., 960 F.2d 1080, 1089 (1st Cir. 1992).  Under this test, a court has jurisdiction where: (1) the claim underlying the litigation directly arises out of, or relates to, the defendant's forum-state activities; (2) the defendant's in-state contacts represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's court foreseeable; and (3) the exercise of jurisdiction is reasonable in light of additional factors referred to as the "gestalt factors".  Id.

### C.    Corporate Defendants

The court first considers the application of the due process analysis to the evidence in the record concerning HCMA and HCCT.

### 1.    Relatedness

Relatedness, a "flexible, relaxed standard," generally requires that the dispute between the parties arise out of the defendant's connection with the forum.  Pritzker, 42 F.3d at 61.  In other words, if the defendant's "forum-related activity is itself the cause and object of the lawsuit," the relatedness inquiry is satisfied.  Id.  See also Nowak v. Tak How Invs., 94 F.3d 708, 715 (1st Cir. 1996) ("jurisdiction that is premised on a contact that is a legal cause of the injury underlying the controversy . . . is presumably reasonable" under relatedness inquiry).  Specific jurisdiction is properly analyzed claim-by-claim, because "[q]uestions of specific jurisdiction are always tied to the particular claims asserted."  Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 289

_____

[5] While plaintiffs allude to a theory of general jurisdiction, they do not elaborate this argument. (Docket No. 52, p. 13).  In any case, defendants' contacts are insufficient to support a theory a general jurisdiction.

(1st Cir. 1999).

The court notes that plaintiffs have not engaged in any sort of claim-by-claim analysis in furtherance of their burden on the relatedness inquiry.  Therefore, the court analyzes this factor to the extent possible from a reading of the complaint and plaintiffs' briefs, but in some cases this feat proves impossible.  In particular, plaintiffs have not identified the governing law as to certain of their claims[6], and in many other cases, they have not expounded on how the particular claim relates to the alleged forum contacts.  Because the plaintiff bears the burden of persuasion on the element of relatedness, plaintiffs' failure to present a thorough argument on this issue proves fatal to their claim in some instances.  Foster-Miller, Inc., 46 F.3d at 145.

### a.       Tort Claims

Plaintiffs plead that they are entitled to relief under "applicable" tort and corporate law for accounting of profits (Count 5), improper use of funds (Count 6), ultra vires acts (Count 7), damage to goodwill (Count 11); corporate veil-piercing (Count 12); and self dealing (Count 13).  However, plaintiffs do not identify the particular state's laws on which they base their tort claims, nor do they elaborate the elements of those laws or explain how defendants' forum contacts relate to those elements.  See Harlow v. Children's Hosp., 432 F.3d 50, 61 (1st Cir. 2005) (in analyzing relatedness in tort context, defendant's in-state conduct must form a material element of proof in plaintiff's case).  Thus, plaintiffs have failed to meet their burden of demonstrating forum contacts related to their tort claims (Counts 5, 6, 7, 11, 12, and 13).[7]

---

[6] The amended complaint alleges that the claims arise under the tort and corporate laws of Puerto Rico, or alternatively, under the tort and corporate laws of the states in which each Hogar CREA entity is located.  (Docket No. 67, ¶ 22).

[7] Where, as here, it is the plaintiff's burden to establish a legal claim, they "must make a respectable effort to argue it, supplying pertinent authorities or accounting for their lack. At least where the proposition is open to doubt, it is not enough to assert it and hope the court will do the research."  Cambridge Literary Properties, Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co., 295 F.3d 59, 67 (1st Cir.2002).

### b.      Trademark Claims

Plaintiffs plead several claims against HCCT and HCMA under federal trademark law: unfair competition (Count 1); dilution of trademark (Counts 2 and 4); trademark infringement (Count 3); and order to cease and desist use of trademark (Count 14).   For the purposes of analyzing relatedness, trademark dilution, infringement, and unfair competition claims are analyzed as tort claims. NeoDevices, Inc. v. Neomed, Inc., 08-cv-375-SM, 2009 U.S. Dist. LEXIS 19987, at *14 (D.N.H. March 12, 2009).   In analyzing either a tort or trademark claim, courts "must probe the causal nexus between the defendant's contacts and the plaintiff's cause of action."   Phillips Exeter, 196 F.3d at 289.   More specifically, a defendant's in-state conduct "must form 'an important, or [at least] material, element of proof' in the plaintiff's case."   Harlow, 432 F.3d at 61 (alteration in original) (citation omitted).   This conduct need not be a "strict" proximate cause, but "a broad 'but-for' argument is generally insufficient."   Id.

Considering each claim, the corporate defendants' contacts do not share a causal nexus with these causes of action.

Federal trademark law provides a cause of action for unfair competition:

> Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1) (quoted in Beacon Mut. Ins. Co. v. OneBeacon Ins. Group, 376 F.3d 8, 14 (1st Cir. 2004)).

Federal law also provides a cause of action for trademark dilution:

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c)(1).

To establish trademark infringement under the Lanham Act, a plaintiff must show that: (1) it "owns and uses" the mark; (2) defendants used the same or similar marks without the plaintiff's permission; and (3) defendants' use of the mark likely confused consumers, thereby causing the plaintiff harm. Venture Tape Corp. v. McGillis Glass Warehouse, 540 F.3d 56, 60 (1st Cir. 2008).

The corporate defendants' contacts with Puerto Rico do not show a causal nexus with these causes of action. The corporate defendants' only contacts with Puerto Rico arise out of the constitution, bylaws, and regulations of HCCT and HCMA which establish relationships with the Puerto Rico Hogar CREA entities, and through visits to Puerto Rico made by HCCT and HCMA officers. However, these contacts are not related to the trademark claims. Plaintiffs do not allege that the infringing use of the "Hogar CREA" mark or any resulting confusion occurred in Puerto Rico. See, e.g., NeoDevices, Inc., 2009 U.S. Dist. LEXIS 19987, at *14-15 (trademark claims fail relatedness inquiry where there is no allegation or evidence that infringing activity or resulting customer confusion occurred in forum state). According to the complaint, the alleged improper use occurred solely in Connecticut and Massachusetts, including through the establishment of Hogar CREA Workforce, LLC, in Connecticut. (Docket No. 67, ¶ 75, 84, 89). Unlike in cases finding a causal nexus in trademark claims, plaintiffs do not allege that the infringement occurred in Puerto Rico or was directed at Puerto Rico through a mailing or internet transmission sent into Puerto Rico. Cf. Gather, Inc. v. Gatheroo, LLC, 443 F. Supp. 2d 108, 115 (D. Mass. 2006) (where "the claimed harm arose out of the publication of a website in Massachusetts which allegedly caused harm to Gather in Massachusetts, [the relatedness] element has been met"); Hasbro, Inc. v. Clue Computing, Inc., 994 F. Supp. 34, 42 (D. Mass. 1997) (observing that courts have found that sending advertising with an infringing mark into a state is sufficient to satisfy relatedness inquiry); McBee v. Delica Co., No. 02-198-P-C, 2003 U.S. Dist. LEXIS 6123 (D. Me. Apr. 14, 2003) (relatedness inquiry satisfied where individuals in forum state accessed offending website and catalogue and defendant sent offending merchandise into state). Here, plaintiffs do not suggest that the corporate defendants

engaged in any trademark violations in or directed at Puerto Rico. Therefore, these contacts are not adequate to establish personal jurisdiction over the corporate defendants as to the trademark claims (Counts 1, 2, 3, 4, and 14).

<b>c.       Breach of Contract Claims</b>

To evaluate whether a plaintiff has presented evidence of a contract claim arising from the defendant's in-forum contacts, the court may "draw inferences from the parties' prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." <u>Jet Wine & Spirits, Inc. v. Bacardi & Co., Ltd.</u>, 298 F.3d 1, 7 (1st Cir. 2002) (internal quotation marks omitted). One consideration is "whether the defendant's contacts with the forum were instrumental either in the formation of the contract or in its breach." <u>Id.</u> (quoting <u>Phillips Exeter</u>, 196 F.3d at 289).

Plaintiffs allege that HCMA and HCCT breached two agreements that may be analyzed as contracts. One alleged agreement is an implied licensing agreement for use of the "Hogar CREA" name. (Count 9). Plaintiffs also allege, as an alternative to their *ultra vires* claim, a breach of a contractual obligation to HCPR and HCI under the Constitution and By-Laws of HCMA and HCCT. (Count 8).[8] Here, the plaintiffs have provided evidence of prior contacts with Puerto Rico that were instrumental to both the formation of the purported contract and the parties' actual course of dealing.

First, plaintiffs have proffered evidence showing that the decision to establish the defendant organizations was made through contacts with Puerto Rico. The plaintiffs provide affidavits by HCI officers describing the establishment of HCMA and HCCT, and the involvement of the Puerto Rico organizations and their officers. (Docket No. 25, ¶¶ 10-11; Docket No. 52, ¶¶ 9-10). In particular, HCMA was formed when HCPR sent an agent to establish the organization in Massachusetts using funds provided by HCPR, and, once legally formed, HCMA became a member of the International

---

[8]This analysis assumes, but does not decide, that the Constitution and By-Laws may create contractual obligations between the parties. Defendants, of course, vigorously dispute such a conclusion. (<u>See</u> Docket No. 41, p. 4). <u>See also</u> note 8, <u>infra</u>.

Steering Committee.  (Docket No. 25, ¶¶ 10-11).  As to HCCT, the organization was formed when

a former HCPR intern moved to Connecticut and sought to form an organization using the Hogar

CREA model, and thereby formed HCCT with the "support, guidance, and direction" of HCPR and

HCI.  (Docket No. 52, ¶¶ 9-10).  Based on this serious involvement of the Puerto Rico organizations

and officers in establishing HCMA and HCCT, it is reasonable to infer that these contacts with Puerto

Rico were instrumental in creating any resulting agreement.

Second, plaintiffs show that the corporate defendants' officers created additional contacts with

Puerto Rico, consistent with the provisions of the agreements.  The plaintiffs provide meeting minutes

and resolutions showing the participation of HCMA and HCCT officers in HCI meetings in Puerto

Rico.  (Docket No. 25, ¶¶ 24-25; Docket No. 52, ¶ 26).  It is therefore reasonable to infer that these

contacts reflected dealing in accordance with the purported contracts, and that these contacts

sufficiently relate to a dispute arising from those contracts.

Because the corporate defendants' alleged contacts with Puerto Rico were likely instrumental

in the formation of the contract and the parties' actual course of dealing, the plaintiffs have satisfied

their prima facie burden and established personal jurisdiction as to the implied licensing agreement

and contract claims.

## 2.      Purposeful Availment

The second prong of the analysis requires the court to determine whether defendants' "Puerto

Rico-based contacts 'represent a purposeful availment of the privilege of conducting activities in

[Puerto Rico], thereby invoking the benefits and protections of [its] laws and making the defendant's

involuntary presence before [the Puerto Rico-based] court foreseeable."  Pritzker, 42 F.3d at 61

(alterations in original) (citing United Elec., Radio & Mach. Workers, 960 F.2d at 1089).  Courts have

explained that the "two key focal points of this concept are voluntariness and foreseeability."

Adelson v. Hananel, 510 F.3d 43, 50 (1st Cir. 2007).  Voluntariness requires that the forum contacts

are "voluntary and not based on the unilateral actions of another party."  Id.  Foreseeability requires

that "defendant's contacts [are] such that he could reasonably anticipate being haled into court" in the

forum state.  Id. (internal citation omitted).

        This case involves many of the same hallmarks of voluntariness and foreseeability that the Supreme Court identified in Burger King v. Rudzewicz.  471 U.S. 462.  Burger King concerned a dispute over a franchise agreement between a Michigan franchisee and Burger King, a Florida corporation.   There, the Court found that although the defendant's physical ties to Florida were minimal, the defendant purposefully established contacts with the forum because: (1) defendant deliberately sought out a franchise relationship with a national corporation rather than creating an independent local establishment; (2) defendant carefully structured and contracted for a twenty-year relationship with Burger King in Florida; (3) defendant voluntarily accepted regulation of his business from Burger King's Florida headquarters; (4) defendant contracted for, and refused to make, payment to Burger King in Florida; and (5) defendant improperly continued to use trademarks and confidential business information of Burger King causing injuries in Florida.  Id., 471 U.S. at 480.

        In Burger King, the Court's analysis concerns, to a great extent, the franchise agreement between the parties.   Here, the parties refer to the constitutions and by-laws of HCMA and HCCT and the constitution of HCI which vests in HCMA and HCCT certain rights and obligations *vis-a-vis* HCI and HCPR. The court need not resolve whether these documents create contractual obligations as a matter of law because Burger King makes clear that it is not the contract itself that creates minimum contacts.  471 U.S. at 479.  Instead, a contract is relevant because "ordinarily [it is] an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of business transactions."  Id.  The Court explained that while a "contract with an out-of-state party *alone*" was insufficient to establish minimum contacts, related factors such as "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" should be evaluated in order to determine whether a party purposefully established minimum contacts in the forum.  Id., 471 U.S. at 478-79 (original emphasis).  To that end, the court will consider the documents in this case along with these other related factors in determining whether defendants have established minimum contacts.

First, HCMA and HCCT offer their services and operate exclusively in Massachusetts and Connecticut, respectively, just as Rudzewicz operated only in Michigan.  However, the Court made clear that it was the business relationship with the forum state and not any physical presence that created minimum contacts, so this fact is of limited relevance.  Burger King, 471 U.S. at 479.

In Burger King, the Court observed that the plaintiff had carefully structured and contracted for a twenty-year relationship with Burger King in Florida.  Here, the U.S. entities have similarly created long-term structured relationships with the Hogar CREA Puerto Rico operations in organizational operating documents that may be modified or amended only with the consent of the Hogar CREA Puerto Rico organizations.  (Docket No. 52-14, p. 18; 28-10, p. 16).  The U.S. entities have adopted the "Hogar CREA" trade name (and trademark), and through their various operating procedures, agreed to submit themselves to the oversight and governance of a web of Hogar CREA structures, including HCPR, HCI, the International Steering Committee (part of HCI), and the National Steering Committee.  (Docket No. 52-14; 28-13; 52-3).  These complex relationships, along with the use of the trade name, shared philosophies, and shared treatment strategies, establishes a long-term connection between the U.S. entities and the Puerto Rico Hogar CREA entities.

These facts also relate to the factor of voluntarily acceptance of regulation from organizational headquarters in the forum state, as the Court found in Burger King.  The Hogar CREA organization's level of regulation in order to ensure uniformity among state entities – emanating from the Puerto Rico organizations – is analogous to (albeit more limited than) the regulations established by Burger King's headquarters in Florida to ensure consistency among its franchises. The constitutions of the U.S. entities establish obligations and ongoing relationships with HCI, including giving HCI the right to appoint the U.S. entity's steering committee and obligating the U.S. entity to implement HCI's treatment philosophy, to comply with the objectives and purposes of HCI, to consult with HCI before opening or closing any treatment homes, to submit reports to HCI, and to participate in international activities sponsored by HCI. (Docket No. 52-14).  The presidents of the U.S. entities are obligated to assume any duties delegated to them by HCI, to implement all decisions of HCI, and to act as

advisors to HCI.  (Id.).  Moreover, the U.S. entity may not amend its constitution or by-laws or dissolve itself without the advice and consent of HCI.  (Id.; 28-10, p. 16).

Another important purposeful availment factor in Burger King was that the plaintiff deliberately sought out a franchise relationship with a national corporation rather than creating an independent local establishment, imparting more benefits to him than if he had created a local restaurant establishment.  However, the First Circuit emphasized that the relevance of this inquiry goes to voluntariness.  Nowak, 94 F.3d at 717.  Thus, the relevant question is not which party "instigated" the relationship, but whether the actions are voluntary or rather the "kind of unilateral action that makes the forum-state contacts involuntary."  Id.  As to HCCT, plaintiffs provide evidence that, in forming the organization, the support of HCI and HCPR added expertise and recognition to the fledgling HCCT, translating into grant funding and state licenses.  (Docket No. 52-10).  In particular, the Hartford City Council noted in its decision to grant funding in support of the establishment of HCCT that Hogar CREA was a "[n]ationally recognized" drug addiction treatment program.  (Id.).  Thus, there is evidence that HCCT benefitted as an organization from its connection with a Puerto Rico organization, as opposed to creating its own independent organization.

On the other hand, evidence suggests that it was plaintiffs who deliberately reached out to Massachusetts, not HCMA attempting to benefit from Puerto Rico connections.  See Burger King, 471 U.S. at 479 (finding plaintiff "deliberately '[reached] out beyond' Michigan and negotiated with a Florida corporation") (alteration in original) (internal citation omitted).  In particular, HCI and HCPR "instructed [Martin Cotto] to organize a Steering Committee, and Incorporate the opening of the first Hogar CREA in the State of Massachusetts."  (Docket No. 34-2, ¶ 2, 3).  Nonetheless, these facts do not turn HCMA's founding into the "kind of unilateral action that makes the forum-state contacts involuntary."  Nowak, 94 F.3d at 717.  Even if "instigated" by HCI, id., HCMA's relationship with the Hogar CREA Puerto Rico entities was still "voluntary" and not "unilateral" for constitutional purposes.

Nonetheless, there are some distinctions from the <u>Burger King</u> facts.  First, the parties here did not voluntarily submit to Puerto Rico forum selection or choice of law clauses as no such provisions (concerning any state's courts and laws) exist in any of the documents in the record here. <u>See</u> <u>Burger King</u>, 471 U.S. at 482 (plaintiff "purposefully availed himself of the benefits and protections of Florida's laws by entering into contracts expressly providing that those laws would govern franchise disputes").  Second, there are no allegations here that defendants failed to pay dues owed to HCI.  <u>See id.</u> (finding forum connection where plaintiff contracted for, and refused to make, payment to Burger King in Florida).

On balance, however, the evidence shows that the U.S. entities have voluntarily created contacts with Puerto Rico such that it was foreseeable they could be haled into court in this forum. The record evidence shows that HCMA and HCCT created long-term relationships with the Puerto Rico entities, and thus with the forum.  In so doing, HCMA and HCCT voluntarily submitted to regulation and oversight from entities in Puerto Rico.  Both organizations voluntarily chose to affiliate themselves with an existing Puerto Rico organization, rather than form an independent local entity. As to HCCT in particular, there is specific evidence that HCCT benefitted from HCI's reputation and experience in forming its organization.  Thus, I find that plaintiffs have put forth adequate evidence to support a finding that HCMA and HCCT have voluntarily and purposefully availed themselves of connections with Puerto Rico, such that jurisdiction in this court is foreseeable.  <u>See</u> <u>Pritzker</u>, 42 F.3d at 61.

**3.      Reasonableness**

As the First Circuit has explained, even after concluding from the first and second prongs of the test that minimum contacts with the forum exist, "personal jurisdiction may only exercised if it would be reasonable, pursuant to a series of factors known as the 'Gestalt Factors.'"  <u>Adelson</u>, 510 F.3d at 51.  These factors include:

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

United Elec., Radio & Mach. Workers, 960 F.2d at 1088 (citing Burger King, 471 U.S. at 477).   The
gestalt factors are "a means of assisting courts in achieving substantial justice" and "[i]n very close
cases, they may tip the constitutional balance." Ticketmaster-New York, 26 F.3d at 209.  The factors
are considered on a sliding scale with the first two prongs:  "the reasonableness prong of the due
process inquiry evokes a sliding scale: the weaker the plaintiff's showing on the first two prongs
(relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness
to defeat jurisdiction." Ticketmaster-New York, 26 F.3d at 210.

First, while defendants' burden of appearing in Puerto Rico litigation is somewhat higher than
for wealthier, for-profit entities, defendants must "demonstrate that exercise of jurisdiction in the
present circumstances is onerous in a special, unusual, or other constitutionally significant way."
Nowak, 94 F.3d at 718.  HCMA asserts that it earns approximately $4,000 per month from the sale
of baked goods to support is patients' expenses, does not receive any financial support from plaintiffs,
and would need to obtain donations from the local community to pay for its legal expenses.  (Id.).
This factor weighs against jurisdiction.

Second, Puerto Rico's interest in adjudicating this dispute stems from its interest in protecting
an important community organization with a long history in Puerto Rico from injuries caused by out
of state actors.  Courts have made clear that this consideration does not weigh Puerto Rico's interest
against that of other states, but simply considers whether Puerto Rico has an interest in the dispute.
Nowak, 94 F.3d at 718.  There is no question that Puerto Rico indeed has an interest in this dispute.

Third, HCPR's and HCI's interest in obtaining convenient and effective relief weighs strongly
in favor of adjudicating the case in Puerto Rico because Puerto Rico appears to be the only forum
where multiple defendants (i.e., more than one of the corporate defendants) may be joined together
in a single litigation.  The First Circuit has explained that avoiding piecemeal litigation is a factor
weighing in favor of exercising jurisdiction.  Pritzker, 42 F.3d at 64 ("we must take note of the
enormous inconvenience that might result from forcing Pritzker to sue elsewhere -- theoretically, in
every jurisdiction in which a financier is located").  Here, denying the exercise of the court's

jurisdiction would require plaintiffs to bring different suits in each state where Hogar CREA entities are located.  It appears that there are legal and factual claims common to the various defendants, and requiring the interpretation of identical constitution and by-law provisions.  (Docket No. 67, ¶ 63, 64, 70, 71).  See Fed. R. Civ. P. 20(a)(2) (defendants may be joined in a single action if "any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and any question of law or fact common to all defendants will arise in the action").

Likewise, the judicial system's interest in obtaining the most effective resolution of the controversy "similarly counsels against furcation of the dispute among several different jurisdictions." Pritzker, 42 F.3d at 64.  This factor thus tips toward the exercise of jurisdiction for the reasons just described.  Finally, the interest in promoting substantive social policies encourages the efficient resolution of the dispute among these worthy organizations.  This does not favor one forum over another except to the extent that adjudication in Puerto Rico has some efficiency benefits over other fora.

On balance, the gestalt factors tip in favor of exercising jurisdiction.  Although it would be burdensome for the corporate defendants to litigate in this forum, it is not so burdensome as to be "constitutionally significant."  Moreover, there are important benefits to plaintiffs and the judicial system of exercising jurisdiction here so as to avoid piecemeal litigation in multiple fora.  Therefore, I find that the court possesses, and should exercise, specific personal jurisdiction over HCMA and HCCT as to the claims for which the relatedness inquiry is satisfied.

### D.      Individual Defendants

Plaintiffs assert that jurisdiction over the individual defendants is supported by the Fourth Circuit's decision in Pittsburgh Terminal Corp. v. Mid-Allegheny Corp., 831 F.2d 522 (4th Cir. 1987). Pittsburgh Terminal is indeed an important decision on the issue of when jurisdiction may be acquired over a non-resident director by virtue of the forum contacts he has established through the directorship.  Id.  However, the analysis in that case counsels against finding jurisdiction here.

Pittsburgh Terminal dealt with whether a West Virginia court had jurisdiction over two non-residents who served as directors on the board of a West Virginia corporation doing business in West Virginia. The court detailed the substantial activities they undertook in their director capacities, concluding that based on the connections those activities had to the forum and the underlying dispute, the non-resident directors were "transacting . . . business" in West Virginia for purposes of the state long-arm statute and the due process analysis.  831 F.2d at 527.

Here, plaintiffs have not put forth the same kind of facts that would support a finding of jurisdiction over the individual defendants.  Most fundamentally, the Pittsburgh Terminal defendants were directors of a corporation incorporated and doing business in the forum state.  With a single exception, defendants here are not directors or officers of Puerto Rico entities, but of Massachusetts and Connecticut corporations.  Moreover, in Pittsburgh Terminal, that directorship of a resident corporation was not alone sufficient to create minimum contacts, but the minimum contacts analysis was based on the substantial activities that defendants undertook through those positions.  Here, plaintiffs put forth evidence of only minimal forum-related activities that the individual defendants undertook through their connections with the Hogar CREA organization.

The easiest cases are as to HCCT officer defendants Oscar Meléndez, Gladys Toledano, Margarita Quiñones, José Antonio Contreras, and Janet Dunning, and HCMA defendant José Molina. Plaintiffs did not offer any evidence concerning the activities of these defendants or their forum connections.[9]  Their relationships with HCCT and HCMA alone are not sufficient to create minimum contacts.

Plaintiffs put forth slightly more evidence concerning HCCT officers Guarberto Santiago and Edwin Rivera Pacheco: Santiago and Rivera traveled to Puerto Rico in August of 2005 to represent HCCT in an assembly of HCI, and Rivera was originally involved with HCPR's operations in Puerto Rico and "was sent" by HCI to participate in the operations of HCCT.  (Docket No. 52, p. 10, 11).

---

[9] Plaintiffs' assertion that Molina has had regular and frequent contacts with HCI and HCPR through mail, email, and telephone, is not supported by any evidence.  (Docket No. 25, p. 10).

However, without more, these facts are insufficient to create minimum contacts.

Plaintiffs' strongest case is as to defendant Gumersindo Gómez.  Gómez is the president of HCMA as well as Secretary of HCI's International Steering Committee, the governing body of HCI. (Docket No. 34-7).  In his position as an officer of HCI, a Puerto Rico corporation, Gomez bears more similarity to the defendants in Pittsburgh Terminal.  Plaintiffs adduce evidence that he traveled to Puerto Rico in August of 2005 to represent HCMA in an assembly of HCI, and was in that meeting elected to the Secretary position.  (Docket No. 28-22; 34-7).   They also note that Gómez was a signatory, again in his capacity as HCMA president, to a resolution concerning internal dissent within the Hogar CREA organizations, and asserting that the signatories were the "authentic representatives of the Hogar CREA movement, and members of Hogar CREA International, Inc."  (Docket No. 48-4).  However, even assuming that these facts would be sufficient to satisfy the purposeful availment test, they would still fail the relatedness inquiry.

The relatedness standard is satisfied where a defendant's "forum-related activity is itself the cause and object of the lawsuit."  Pritzker, 42 F.3d at 61.  Plaintiffs have not explained how Gómez's actions in signing the resolution or traveling to Puerto Rico for the HCI assembly relate in any way to the claims in this case.  To satisfy relatedness as to both the tort and trademark claims, Gómez's Puerto Rico conduct "must form an important, or [at least] material, element of proof in the plaintiff's case."  Harlow, 432 F.3d at 61 (alteration in original) (citation omitted).  Plaintiffs do not offer any suggestion as to how Gómez's participation in the HCI assembly or signing of the resolution forms an "element of proof" as to their tort and trademark claims.  As to plaintiffs' contract claims, plaintiffs need to prove that Gómez's Puerto Rico contacts "were instrumental either in the formation of the contract or in its breach."  Jet Wine & Spirits, Inc., 298 F.3d at 7.  Again, there is no indication that Gómez's forum contacts were in any way related to the formation of the putative contracts or to their breach. Therefore, plaintiffs have failed to establish personal jurisdiction over defendant Gumersindo Gómez.

Moreover, there is no evidence that the individual defendants here voluntarily availed

themselves of benefits analogous to those received by Rudzewicz in Burger King. While the benefits accruing to his franchise business based on the affiliation with a national organization translated into increased profits for him, the same cannot be said for the individual defendants here. Although the affiliation with the Puerto Rico-based Hogar CREA entities imparted important benefits to, at least, the HCCT corporate entity in the form of increased recognition translating into state licenses and grant funding, there is no evidence that these benefits directly accrued to the individual defendants. For example, plaintiffs do not offer any evidence concerning the individual defendants' salaries or any other financial benefits, or even any non-monetary benefits the individuals received as a result of their organizational affiliation with the existing Hogar CREA entities. Moreover, the HCMA defendants put forth undisputed evidence that the HCMA officers and directors serve on a purely volunteer basis. (Docket No. 41, p. 6).

Further, the reasonableness factors also counsel against the exercise of jurisdiction. The First Circuit has made clear that "the reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction." Ticketmaster-New York, 26 F.3d at 210. Thus, similar factors as considered in the context of jurisdiction over the corporate defendants, when viewed here, are insufficient to overcome plaintiffs' poor showing on the relatedness[10] and purposeful availment prongs. There is undisputed evidence that defending themselves in Puerto Rico would exact a high toll on the individual defendants: for example, HCMA's officers and directors – including Gómez – work voluntarily, are mostly former blue-collar workers retired due to disability, and lack the financial resources to travel to Puerto Rico. (Docket No. 41, p. 6). These facts "demonstrate that exercise of jurisdiction in the present circumstances is onerous in a special, unusual, or other constitutionally significant way." Nowak, 94

_____

[10] Based on the court's findings as to purposeful availment and the reasonableness factors, the court need not undertake a claim-by-claim analysis of the relatedness element of the personal jurisdiction test for individual defendants other than Gómez.

F.3d at 718. While "the need to travel between [Massachusetts] and Puerto Rico creates no especially ponderous burden for business travelers," Pritzker, 42 F.3d at 64, HCMA has adequately shown that the organization and its members are not typical business travelers but volunteers with relatively low-incomes working for an organization that itself has a very small budget.  As to HCCT, the HCCT defendants assert that, with the sole exception of defendant Edwin Rivera Pacheco, all HCCT individual defendants work for HCCT on a voluntary, unpaid basis.  (Docket No. 42, p. 8).  They also state that, based on connections in Connecticut, they have found a Hartford law firm willing to represent them on a pro bono basis, but have not been able to retain pro bono counsel in Puerto Rico. (Id.).  Moreover, it is unclear to the court that any significant policies would be furthered by allowing plaintiffs' claims against the individual defendants to proceed.  Plaintiffs have not explained why this case requires the unique step of "piercing the corporate veil" in order to obtain relief from these individual defendants.[11]  The court believes that substantive policies and fairness principles would be better advanced by declining to exercise jurisdiction over these out of state individual defendants: it is unreasonable to require volunteer officers of a small, charitable organization to travel to another state to personally defend themselves simply by virtue of their civic-mindedness in working with an organization that itself has contacts to another forum.

Therefore, the court finds that it does not have personal jurisdiction over the individual defendants based on their lack of minimum contacts with Puerto Rico, and further finds that the exercise of jurisdiction would be improper based on the unreasonableness of requiring the individual defendants to personally defend themselves in this forum.

---

[11] While it is unclear in what sense plaintiffs intend to apply a "veil piercing" theory, which is more commonly employed to reach a parent corporation of a shell subsidiary, such a claim does not help them achieve jurisdiction over the individual defendants here.  Courts have noted that the First Circuit "suggested a significantly heightened standard for the exercise of personal jurisdiction, based exclusively on veil-piercing factors, over a foreign defendant, including a showing of fraud." Filler v. Lernout (In re Lernout & Hauspie Sec. Litig.), 337 F. Supp. 2d 298, 314 (D. Mass. 2004) (citing United Elec., Radio & Mach. Workers, 960 F.2d at 1093).

### E.        Additional Time for Discovery

Plaintiffs request, in the alternative, additional time for discovery concerning jurisdictional facts. (Docket Nos. 25, p. 14; 52, p. 24).  Plaintiffs do not argue that defendants "alone ha[ve] knowledge of the relevant jurisdictional facts."  Boit, 967 F.2d at 681.  They assert that discovery could shed light on facts concerning the founding of HCCT and HCMA and defendants' contacts with Puerto Rico.  However, given the close relationships among the parties, as well as plaintiffs' arguments that defendants' ties to the forum arise through their relationships *with plaintiffs*, the court is not persuaded that plaintiffs' showing of jurisdiction requires discovery of some facts solely in the possession of defendants.

### II.      <u>Venue</u>

Defendants request, in the alternative, that the case be transferred to the venues of the District of Massachusetts and Connecticut, respectively.  In an action premised on both federal question and diversity jurisdiction, venue is proper in:

> (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

38 U.S.C. § 1391(b).[12]  However, defendants' arguments are not persuasive.  They base their legal argument primarily on the argument that venue is improper because personal jurisdiction is improper.  In that way, their argument is not truly an alternative argument.  They do not make any legal argument concerning transfer of venue; in fact, they do not so much as cite or reference any of the statutes governing transfer of venue, 28 U.S.C. § 1404 or § 1406.  In any event, venue is proper under part three, because there is no other district in which jurisdiction over both HCMA and HCCT may be had.

### CONCLUSION

For the foregoing reasons, defendants' motions to dismiss are **DENIED** as to plaintiffs'

---

[12] Commentators note that the language "in which any defendant may be found" should be interpreted as "wherever the defendant is subject to personal jurisdiction."  Wright, Miller, & Cooper, <u>Fed. Practice and Procedure: Jurisdiction</u> 3d § 3806.2 (2007).

Causes of Action Eight and Nine (breach of contract and breach of implied trademark licensing agreement) as against HCCT and HCMA, and are **GRANTED** as to all other claims and all other defendants.  Further, defendants' motion to transfer venue is **DENIED** and plaintiffs' motion for additional time for discovery is **DENIED**.

      **IT IS SO ORDERED.**

      In San Juan, Puerto Rico, on this 10th of August, 2009.


                                            *S/Bruce J. McGiverin*
                                            BRUCE J. McGIVERIN
                                            United States Magistrate Judge